**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| MALIBU MEDIA, LLC, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>JOHN DOE subscriber assigned )<br>IP address 66.176.59.75, )<br>)<br>Defendant. )<br>_____ | Civil Action No.<br>1:14-cv-20393-CMA |

**DEFENDANT JOHN DOE'S REPLY MEMORANDUM TO DOC. 17**

COMES NOW Defendant "John Doe" subscriber assigned to IP Address **66.176.59.75**, in a special, limited appearance by and through the undersigned attorney, pursuant to Local Rule 7.1(c), and files this Reply Memorandum to Doc. 17.

I. **Plaintiff tries to obfuscate the main issue**

> The most persuasive argument against permitting plaintiffs to proceed with early discovery arises from the clear indicia... that plaintiffs have employed abusive litigations tactics to extract settlements from John Doe defendants. Indeed, this may be the principal purpose of these actions, and these tactics distinguish these plaintiffs from other copyright holders with whom they repeatedly compare themselves.[1]

Plaintiff's tale of how its owner turned from struggling real-estate agent to pornography entrepreneur is an effort to obfuscate the Court's eyes away from the individuals, in Germany, who really drive this case. While Plaintiff alleges

---

[1] *In re BitTorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. 80, 89 (E.D.N.Y. 2012) (consolidating copyright infringement pornographic film cases, including filed by Malibu Media).

that it named its smut brand "X-Art" because of an "artistic" "vision," others may see the X-Art name as a calculated ploy to avoid judicial scrutiny given to other pornography, which may lack enough artistic value to be sufficiently copyrightable.[2] It is not mere irony that Malibu Media filed its very first six lawsuits, Eastern District of Pennsylvania Case Nos. 2:12-cv-00664, 2:12-cv-00665, 2:12-cv-00665, 2:12-cv-00667, and 2:12-cv-00668, on February 8, 2012[3] — the very date Malibu Media's limited liability company was created with the California Secretary of State.[4]  Since that somewhat monumental date — the creation of both Malibu Media and its litigation empire, the number of Malibu Media lawsuits in the federal courts is 2402[5] and growing.

## II. **Plaintiff *has* alternatives to protect its copyrights**

Next, Plaintiff argues, wrongly, that it has "no alternate means to identify" potential infringers but to contract with hacker(s) in Germany. Surely, Plaintiff, a California company

---

[2] "[I]f the Motion Picture is considered obscene, it may not be eligible for copyright protection." *Next Phase Dist., Inc. v. Does 1-27,* 1:12-cv-03755-VM, 2012 U.S. Dist. LEXIS 107648 *16 (citing *Liberty Media Holdings, LLC v. Swarm Sharing Hash File and Does 1-38*, 821 F. Supp.2d 444, 447 n.2 (D. Mass. 2011); *see also Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) (obscene works may be precluded from copyright protections); *Media Products, Inc. DBA Devil's Film v. Does 1-26,* 1:12-cv-03719-HB [Doc. 9 at 4] (citing *Raw Films, Inc. v. John Does 1-32*, 2011 WL 6840590, at *2 n.5 (N.D. Ga.)) ("Congress intended to incentivize the creation of useful arts by providing a statutory right and a means of enforcement that would reward authors for their labors, hardly the Plaintiffs' strategy here")

[3] Pacer.gov

[4] *See* California Secretary of State, http://kepler.sos.ca.gov/ (select "Business Entities," then "Business Search," then search for limited liability company "Malibu Media") (showing Entity Name: Malibu Media, LLC; Date filed: 02/08/2011).

[5] Pacer.gov (last check June 25, 2014).

represented by a Florida law firm, can find a legitimate, licensed investigator in the United States. Furthermore, Malibu Media has alternative means to protect its copyrights but chooses not to engage in them because, contrary to its assertions, its lawsuits are *lucrative*.

In all of its lawsuits, Malibu Media always sues individual file sharers rather than the *initial seeder*, which is the person who uploads the film to the BitTorrent stream in the first place.[6] One legal scholar opined:

> Failure to differentiate [between the initial seeder and subsequent downloaders] casts a wide net because it does not focus on the root cause. The focus in BitTorrent copyright infringement cases should be on the initial seeder, or the individual who first made the file available on the web. Finding and curing the root of the problem is essential to remedying the entire system.

Jeannie Roebuck, *BitTorrent Sharing: The Case Against the John Does*, 18 INTELL. PROP. L. BULL. 35, 55-56 (Fall 2013).

Furthermore, Malibu Media continues to publish video content without copyright protection. Because Malibu Media's

---

[6] *See also* SJD, *Why do copyright trolls ignore the big fish*? at http://fightcopyrighttrolls.com/2014/06/08/why-do-copyright-trolls-ignore-the-big-fish-initial-seeders/, explaining in part:

> I monitored X-Art's new releases for a month, and found out that **their clips appear on the Pirate Bay almost exactly two hours after the release**. The overwhelming majority of these releases are seeded by a highly active user named Drarbg, presumably a bot that aggregates pirated content from other sources. Whoever operates this bot must be linked to someone who has access to the client area of the xart.com: if not an insider, then at least a person that paid for a subscription. So, are there ways to figure out who is the source of daily leaks? If so, is such investigation affordable? The answer is *yes* to both questions.

videos are only available to paid subscribers, the initial seeder(s) must have subscriber access to Malibu Media's website. Therefore, Malibu Media could insert into their videos unique identifiers, or "digital watermarks," embedded data that are "imperceptible to human senses but easily extracted by digital devices" and "can contain virtually any information required by the application at hand: copyright notices, date-time stamps, MPAA ratings, etc."[7]  Because its videos are released by subscribers, Malibu Media *could* use this technology to narrow down which paid subscriber(s) downloaded its content (initial seeders) at which date and time, and cross reference same with its server logs.

### III. Malibu Media lacks factual support to identify the Internet subscriber as the infringer

Next, in an effort to legitimize its German witnesses, Malibu Media argues that "federal law enforcement rely on the same technology" (Doc. 17 at 9).  If that is the case, however, why do Malibu Media not utilize this technology *through a licensed investigator in this country*?

Furthermore, it is well known that federal law enforcement rely upon more than just an IP address before actually suspecting someone of a crime.  In a case involving child pornography, a federal court adopted the following view on IP addresses:

> Much, if not all, of the cyber-evidence (the E-mail addresses and IP addresses used) will lead you to an innocent person. That's why simply identifying which account was used to commit a crime does not provide you with probable cause to get a search or arrest

---

[7] White Paper: Digital Serial Numbers and Piracy Deterrence, Digital Watermarking Alliance, at 3, available at http://www.digitalwatermarkingalliance.org/docs/papers/DWA_White Paper_PiracyDeterrence.pdf

> warrant for the name and address on that account. You'll need to do more investigating to determine if there is a link between the account holder (or other members of the household) with the criminal activity that was committed with that account.

*Chism v. Wash. State*, 655 F.3d 1106, 1116 (9th Cir. 2011). In the same manner, several federal courts of appeals require more than just an IP address. These courts require evidence that a specific user of a computer employing the particular IP address possessed or transmitted child pornography.[8]

In this case, with nothing more than an IP address, Malibu Media has concluded that Defendant, the accountholder, is the infringer. Yet, Malibu Media has not provided any additional evidence as federal law enforcement officers would require. Moreover, federal law enforcement officers are properly licensed and do not rely on unlicensed German hackers to conduct their investigations, as such investigations would be improper and inadmissible.

Plaintiff relies on *Tillotson* and *Richardson* (Doc. 17 at 9-10) for the misleading proposition that, because both it and the federal agents in those cases used maxmind.com, Plaintiff's reliance on the IP address is sound evidence that Defendant is the alleged infringer. Maxmind is only used to link an IP address to an ISP, not uncover the IP address in the first place. The magistrate's report and recommendation in *Tillotson*

---

[8] *See United States v. Vosburgh*, 602 F.3d 512, 526-27 (3d Cir. 2010); *United States v. Stults*, 575 F.3d 834, 843-44 (8th Cir. 2009); *United States v. Perrine*, 518 F.3d 1196, 1205-06 (10th Cir. 2008); *United States v. Perez*, 484 F.3d 735, 738-40 (5th Cir. 2007); *United States v. Wagers*, 452 F.3d 534, 539 (6th Cir. 2006)); *United States v. Hay*, 231 F.3d 630, 634-35 (9th Cir. 2000); *United States v. Bynum*, 604 F.3d 161, 165 (4th Cir. 2010).

does not even identify how the federal agent was able to determine the alleged uploader's IP address.  The issue in *Tillotson* was whether the information relied upon to receive the warrant was stale.  The magistrate in *Tillotson* did not address the issue present in this case: whether an IP address alone can link a cause of action to a specific person.  In fact, in *Richardson*, the federal agent conducted an extensive background check on the owner of the cell phone from which the IP address originated and conducted surveillance on the mailing address for the IP address before determining that the actual owner of the IP address was not even the person who uploaded the child pornography.  The court found that all of this evidence gave the federal agent probable cause for a search warrant, not just evidence of an IP address.

Before it can determine so matter-of-factly that Defendant Internet accountholder infringed its copyrights, Malibu Media needs to do more investigating.  Such investigation could include sending a private licensed investigator to the location of the wireless router and determining whether the router is password protected, determining the strength of the signal, and determining which and how many media access control (MAC) addresses are connected to same at a given time.

## IV. Rule 26 Would Deny Discovery of John Doe's Information

Next, the Federal Rules direct the Court to deny discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The nature of the copyrighted material - pornography – necessarily engenders embarrassment and concern for damage to one's reputation.  Several courts have taken note of the likelihood that revealing the identity of a subscriber of an IP address alleged to have downloaded copyrighted pornography could "engender extortionate settlement." *SBO Pictures, Inc. v. Does*

*1-3036*, 2011 U.S. Dist. LEXIS 137361, 2011 WL 6002620, at *3 (N.D.Cal. Nov. 30, 2011)(defendants "whether guilty of copyright infringement or not-would then have to decide whether to pay money to retain legal assistance to fight the claim that he or she illegally downloaded sexually explicit materials, or pay the money demanded. This creates great potential for a coercive and unjust 'settlement'"); *Pacific Century Int'l, Ltd. v. Does 1-37*, 282 F.R.D. 189, 2012 U.S. Dist. LEXIS 44368, 2012 WL 1072312, at *3 (N.D. Ill. Mar. 30, 2012) ("subscribers, often embarrassed about the prospect of being named in a suit involving pornographic movies, settle"); *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 229, 2012 U.S. Dist. LEXIS 10803, 2012 WL 263491, at *3 (S.D.N.Y. 2012) ("This concern, and its potential impact on social and economic relationships, could compel a defendant entirely innocent of the alleged conduct to enter an extortionate settlement"). To cause shame and dishonor on the individual who happened to have his/her name on an Internet account, when another person who used the Internet connection could have been the culprit, is oppressive, unjust, harsh, and embarrassing.

**V.    Fieser, Patzer: They're all IPP, does it make a difference?**

Next, although "Humans play no part in the creation or storage of the evidence" (Doc. 17 at 3), as Plaintiff argues, humans can still create a "honeypot" trap.

Malibu argues that if it directly pays a cut of its recovery to IPP, rather than Mr. Fieser, then allowing IPP's "employee" to testify is OK. Is Mr. Fieser not an agent of IPP? Therefore, if Mr. Fieser is acting in his capacity as an agent of IPP, IPP is the witness, which is still improper. Malibu Media would have us naively believe that an employee of a company paid on a contingency-fee basis would not be influenced

to testify in such a manner that the contingency fee is in fact earned.  If all one had to do to get around the rule that a witness cannot be paid on a contingency-fee basis would be to have an employee testify, this would indeed be a victory for the unscrupulous.

Furthermore, if Mr. Patzer is Plaintiff's investigator, he too is not licensed under Florida's private investigator requirements as found in Chapter 493, Florida Statutes. Therefore, the same arguments that apply to Mr. Fieser apply equally to Mr. Patzer.

If Malibu Media does not plan to ask Mr. Fieser to testify, it will not be able to authenticate its evidence.  In order to introduce evidence, Malibu Media must establish a chain of custody from the time the evidence was taken to show that it is in "substantially the same condition as when [it was] seized." *United States v. Turpin*, 65 F.3d 1207, 1213 (4th Cir. 1995) (citations omitted).  Each witness who handles evidence is a link in the chain of custody, and each link must be accounted for. *See, e.g.*, *Gencorp, Inc. v. Wolfe*, 481 So.2d 109 (Fla. 1st DCA 1986) (finding the absence of a chain of custody fatal to the introduction of evidence).  The initial person to extract the data, which allegedly implicates Defendant, is arguably the most important person to testify as to the authenticity and accuracy of the incriminating evidence.  It is imperative that cross-examination uncovers any tampering and the method used to extract infringing IP addresses was accurately implemented.  If Mr. Patzer merely received the files from Mr. Fieser, the evidence cannot be authenticated properly.  Likewise, if this method for uncovering infringing IP addresses is so complicated that Malibu Media has to go all the way to Germany to find someone who can do it, then it is even more imperative to ensure the methodology for gathering the data is accurate.  Mr. Fieser

extracted the data. *E.g.*, Doc. 9-4 at 3. Mr. Fieser must authenticate the data. (It is also convenient for Malibu Media that the cost of bringing its key witness, Mr. Fieser, to testify in Florida, is too cost prohibitive for most defendants to accommodate.)

If what appears true so far is confirmed, that what Malibu Media's "suit formation" process occurred during the term of the oral contingency agreement it had in place with IPP, then IPP, Mr. Fieser, Mr. Patzer, and everyone else connected to IPP should be *per se* excluded, and the case dismissed with prejudice because there is no foundation for any of it. Additionally, Malibu Media should be required to disclose to the Court each and every individual and entity with a financial interest in the outcome of the litigation.

In the alternative to dismissal, Defendant asks that the Court enter a limited protective order to stay the subpoena until Defendant can conduct discovery to determine the legitimacy of Malibu Media's claims, or, Defendant asks the Court to have Malibu Media show cause as to these claims. Defendant would seek evidence of any and all payments made to IPP and to Mr. Fieser and anyone else in Germany related to this issue since 2012 when Malibu Media began filing these lawsuits.

## VI. GuardeLay's Maintenance and Champerty in Copyright Cases

Champerty requires a party unrelated to the lawsuit to form an agreement with a litigant in the suit to help pursue the litigant's claim in consideration for receiving part of the judgment. *Law Office of David J. Stern, P.A. v. Sec. Nat'l Servicing Corp.*, 969 So. 2d 962, 975 (Fla. 2007); *citing* Black's Law Dictionary 246 (8th ed. 2004). "[Maintenance] is the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring an action or to

defend a suit which they have no right to make." *Kraft v. Mason*, 668 So. 2d 679, 681 (Fla. 4th DCA 1996).

Plaintiff's lucrative field of copyright infringement litigation is grounded in maintenance and champerty. Their business model is to solicit film producers and law firms, by marketing their IP tracking software, to join them in generating lawsuits on a wide scale and thereafter sharing in the "profits" generated from such litigation. Guardaley appears to have originated this business model. *E.g.*, Doc. 9-4 at 29-47; Doc. 9-4 at 26-28 (2008 email from Guardaley managing partner soliciting a law firm to partner with him to spawn large-scale litigation). Guardaley had a good run at these sweeping lawsuits, until a German court found their IP tracking software was not 100% accurate. *E.g.* Doc. 9-4 at 34.

It has become increasingly evident that IPP is merely a shell company for Guardaley. *E.g.*, Doc. 9-4 at 5. Guardaley essentially disappeared from the pornography copyright infringement cases after the devastating German court ruling. Thereafter, IPP, which is also based out of Karlsruhe, appeared to pick up where Guardaley left off. Interestingly, Guardaley has left a trail that links it to IPP. *See* Doc. 9-9 at 1-2 (the email address for a employment position at IPP happens to be jobs@guardalay.com).

Finally, a recently leaked Guardaley sales manual is cause for alarm[9] as it demonstrates how these "forensic experts" are undermining our legal system. Guardaley, as evidenced in its manual, presents itself via multiple shells as a mere "forensic expert." It is in fact a very well organized business monetizing illegal file-sharing: it recruits attorneys and plaintiffs, and actually steers the industrial-scale litigation campaign. *See also* Doc. 9-4 at 27.

---

[9] Devil's Cookbook: Guardaley's Presentation (Apr 21, 2014) at http://fightcopyrighttrolls.com/2014/04/21/devils-cookbook-guardaleys-presentation/

**CERTIFICATE OF SERVICE**

I hereby certify that I filed electronically the foregoing with the Clerk of the Court via CM/ECF system which will notify electronically all parties.

*Attorney for John Doe:*

**Cynthia Conlin, P.A.**
1643 Hillcrest Street
Orlando, Florida 32803
Tel 407-965-5519
Fax 407-545-4397
www.cynthiaconlin.com

/s/ Cynthia Conlin, Esq.
CYNTHIA CONLIN, ESQ.
Florida Bar No. 47012
cynthia@cynthiaconlin.com